# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION

### CASE NO. 16-25378-CIV-MORENO/GOODMAN

CLUB MADONNA, INC.,

     Plaintiff,

v.

CITY OF MIAMI BEACH,

     Defendant.

_____/

### REPORT AND RECOMMENDATIONS ON
### <u>MOTIONS FOR SUMMARY JUDGMENT</u>

The case is about the Miami Beach Human Trafficking Ordinance[1] (the "Ordinance") enacted by the City of Miami Beach (the "City") after police discovered that a thirteen-year-old girl, who was a sex trafficking victim, was dancing at Club Madonna, Inc. ("Club Madonna" or the "Club"). In sum, the Ordinance requires Club Madonna to verify the age and work eligibility of its performers and ensure that they are not being forced or intimidated into working at Club Madonna. Club Madonna must also maintain records confirming this information and those records are subject to surprise inspection by the City.

Following a ruling on the City's motion to dismiss, the following counts from Club

---

[1]     The Ordinance is Chapter 18, Article XVI of the City of Miami Beach Code.

Madonna's Complaint remain: **Count 7** (alleging that the Ordinance is an unconstitutional burden on Club Madonna's speech, in violation of the First Amendment); **Count 13** (alleging that the Ordinance is expressly and impliedly preempted by federal immigration law); and **Count 16** (alleging that the Ordinance allows the City to conduct a warrantless administrative search and seizure in violation of the Fourth Amendment).

Club Madonna filed a summary judgment motion seeking a declaration that the Ordinance is unconstitutional under the First Amendment (Count 7) and the Fourth Amendment (Count 16) and is preempted by federal immigration law (Count 13). [ECF No. 112].[2] The City filed a response in opposition and Club Madonna filed a reply. [ECF Nos. 124; 128]. Club Madonna also filed a notice of supplemental authority in support of its summary judgment motion relating to Count 16. [ECF No. 141].

The City filed its own summary judgment motion seeking summary judgment in its favor and a finding that (1) the Ordinance is not preempted by federal immigration law (Count 13) and (2) the Ordinance does not violate the Fourth Amendment (Count 16). [ECF No. 116]. Club Madonna filed a response in opposition and the City filed a reply. [ECF Nos. 122; 127].

---

[2]      Club Madonna also argued in its summary judgment motion that it is entitled to a declaration that the Ordinance is preempted by state law, which was addressed in Count 15 of Club Madonna's complaint. [ECF No. 112, p. 2]. However, Judge Moreno dismissed Count 15. [ECF No. 140, p. 1]. Therefore, the Undersigned will not discuss Count 15 (or any other count that was dismissed and is no longer at issue).

United States District Judge Federico A. Moreno referred to the Undersigned all rulings on pretrial, non-dispositive matters and a Report and Recommendations on all dispositive matters. [ECF No. 77]. For the reasons stated below, the Undersigned **respectfully recommends** that the District Court **grant** Club Madonna's summary judgment motion and enter a declaration finding that the Ordinance is unconstitutional under the First Amendment (Count 7) and the Fourth Amendment (Count 16) and is preempted by federal immigration law (Count 13); and **deny** the City's summary judgment motion (Counts 13 and 16).

## I.      Background

First, the Undersigned notes that the individual facts of this case are largely (though not entirely) irrelevant to an assessment of the competing summary judgment motions. Specifically, the facts underlying the facial constitutional challenges asserted by Club Madonna against the City's Ordinance are irrelevant. Judge Moreno previously granted the City's first motion to dismiss Club Madonna's complaint. [ECF No. 33]. On appeal, the Eleventh Circuit reversed and remanded to the district court for further proceedings. [ECF No. 74]. In doing so, the Eleventh Circuit noted that, as to Club Madonna's preemption claims (including Count 13), "[f]urther factual development <u>cannot</u> assist in resolution of these facial challenges, ***which raise purely legal issues***." *Id.* at p. 17 (emphasis added). Further, the Eleventh Circuit noted that Count 16 (warrantless search and seizure under Fourth Amendment), "***presents purely legal questions***." *Id.* at

pp. 16-17 (emphasis added).

Accordingly, the individual facts relating to Count 13 (preemption by federal immigration law) and Count 16 (warrantless search and seizure under Fourth Amendment) are irrelevant. *See Sentinel Commc'ns Co. v. Watts*, 936 F.2d 1189, 1197 (11th Cir. 1991) (internal citation omitted) ("In a facial challenge such as this, the facts of the challenging party's case are irrelevant.").

However, the undisputed facts are provided below as helpful background information *and* because they are necessary to resolve Count 7 (unconstitutional burden on speech).

**A.     *Undisputed Material Facts***

Club Madonna owns and operates a nonalcoholic beverage establishment in Miami Beach that features performances by dancers in the nude. [ECF No. 113, ¶ 2]. Club Madonna has presented nude erotic dance entertainment at this location for more than twenty-five years. *Id.* at ¶ 5.[3]

In January 2014, a human trafficking investigation revealed that a 13-year-old

---

[3]     The City *contends* that this fact is disputed, but it does not deny that this statement is true. It merely says that the affiant is unqualified to testify to this fact. *See Katchmore Luhrs, LLC v. Allianz Global Corp. & Specialty*, No. 15-cv-23420, 2017 WL 432671, at *5 (S.D. Fla. Jan. 31, 2017) (internal quotation marks and citations omitted) ("The non-movant cannot defeat summary judgment by (a) resting upon mere allegations or denials, (b) simply saying the facts are in dispute, or (c) relying on evidence that is merely colorable or not significantly probative."). If this statement were incorrect and Club Madonna has not been operating for 25 years, it would be easy for the City to provide evidence to rebut this. But it did not do so.

human trafficking victim performed nude at Club Madonna on Friday, December 27, 2013; Saturday, December 28, 2013; Thursday, January 2, 2014; Friday, January 3, 2014; and Saturday, January 4, 2014. [ECF No. 115, ¶ 4].  According to the Investigators' Report, the traffickers selected Club Madonna as the location because one of the girl's captors worked there and could bring the 13-year-old into the nude dance club by simply vouching for her. *Id.* at ¶ 5.

Following this discovery, the City Manager, on January 10, 2014, issued an emergency order revoking Club Madonna's Business Tax Receipt and Certificate of Use. [ECF No. 115-7]. The City agreed to stay the order upon Club Madonna's completion of specific conditions, including: hiring a Chief Compliance Officer, agreeing that it will not employ or hire performers who are escorted by another person who appears to have control over them, adopt measures to guard against human trafficking, require the performer to provide two forms of identification and a declaration that he or she is not being forced or intimidated into performing, adopt a check-in/check-out procedure to verify this information, and allow the City access to these records upon demand. *Id.*

In early 2015, the City of Miami Beach enacted the Ordinance [Chapter 18, Article XVI (Ord. No. 2015-3917 and Ord. No. 2015-3926, codified as §18-913, §18-914 and §18-915) of the Miami Beach Code of Ordinances]. *Id.* at ¶ 6. The Ordinance appears in the record as Exhibit "B" to Club Madonna's complaint (ECF No. 1-2), *Id.* at ¶ 7, and provides:

**Sec. 18-913. - Proof of identification for workers and performers, and shift logs required.**

All nude dance establishments as defined in section 142-1271 of the city Code, and as such section may be amended from time to time, must:

(1) Require any worker or performer entering the nude dance establishment to provide proof of an original, lawfully issued state or federal photo identification, and one additional form of identification that confirms he or she is:

> (a) Eighteen years of age or older; and

> (b) Is either a U.S. Citizen, legal resident, or otherwise legally permitted to be employed within the United States of America.

(2) Confirm that the person is working or performing of his or her own accord and is not being forced or intimidated into working or performing at the nude dance establishment. The confirmation as set forth within this subsection shall be pursuant to, and in compliance with subsection (4); and

(3) Maintain copies of those documents required in subsection (1) and (2) herein, and those documents must at all times be on the premises of the nude dance establishment for the duration the worker or performer is employed, hired or contracted at, or is permitted to work or perform at the nude dance establishment; and

(4) Verify the accuracy of those documents required in subsection (1) and (2) by preparing and retaining a sworn statement from the owner or manager of the nude dance establishment confirming that the individual performer is at least 18 years of age, is performing of her or his own accord, and is not being forced or intimidated into performing or working; and

(5) Maintain a check in/check out procedure and log whereby the documents referenced in subsection (1) are presented by the worker or performer upon entering the nude dance establishment, and the worker or performer logs in upon entering and logs out prior to exiting the nude dance establishment. The log shall indicate:

(a) The name(s) of the manager(s) of the nude dance establishment on duty at the time of the log in and log out;

(b) The worker or performer's actual name; a unique identifier, if any (e.g., employee number or stage name); the job title or role at the nude dance establishment (e.g., performer, employee, server, bartender); the log in and log out times; and

(c) The manager who confirmed that the identifications referenced in subsection (1) were inspected and verified.

The documents referenced in subsections (1) through (5) must be available for inspection by the city upon demand, and the nude dance establishment shall not refuse access to these documents for inspection by the city. No person shall be allowed to enter or perform at the nude dance establishment or who has not been presently verified consistent with those provisions identified within subsections 18-913(1) through (5).

**Sec. 18-914. - Compensation for workers and performers.**

A nude dance establishment, as defined in section 142-127 of the city Code, and as such section may be amended from time to time, must:

(1) Provide direct monetary or non-monetary compensation to any worker or performer at a nude dance establishment, and shall maintain documentary proof acknowledging that the monetary or non-monetary compensation was directly received by the worker or performer. The documentation must identify the performer or worker receiving the compensation, and will acknowledge that no other individual, person, or entity was entitled to, or received the compensation on behalf of the worker or performer. The nude dance establishment shall not compensate any worker or performer through a third-party intermediary or business entity.

(a) A nude dance establishment shall maintain these compensation records for performers and workers, and the city shall have a right to request and inspect the records for any and all workers or performers at a nude dance establishment.

(2) A worker or performer who works or performs at a nude dance establishment for a period of less than four days within a calendar year shall be exempt from this section.

**Sec. 18-915. - Enforcement; penalties.**

(a) *Civil fine for violators*. The following civil fines must be imposed for a violation of sections 18-913 and 18-914:

> (1) First offense within a 12-month period must be a fine of $5,000.00;

> (2) Second offense within a three-year period must be a fine of $10,000.00;

> (3) Third offense and subsequent offenses within a five-year period must be a fine of $20,000.00.

(b) *Enforcement*. The code compliance division or the Miami Beach Police Department shall enforce the provisions of this section. This shall not preclude other law enforcement agencies or regulatory bodies from any action to assure compliance with this section, and all applicable laws. If an enforcing officer finds a violation of this section, the officer may issue a notice of violation to the violator. The notice of violation must inform the violator of the nature of the violation, amount of fine for which the violator is liable, instructions and due date for paying the fine, notice that the violation may be appealed by requesting an administrative hearing within ten days after service of the notice of violation, and that failure to appeal the violation within the ten days, shall constitute an admission of the violation and a waiver of the right to a hearing.

[ECF No. 1-2].

Performers hired by Club Madonna enter into "lease agreements" with Club Madonna. *Id.* at ¶ 10; [ECF No. 115-4, pp. 58 (stating there is "no employment relationship")]. Deejays hired by Club Madonna enter into independent contractor

agreements with Club Madonna. [ECF No.115-4, pp. 11, 39].[4]

Before enactment of the Ordinance, Club Madonna checked IDs for age verification when performers and employees first became associated with Club Madonna. [ECF No. 113, ¶ 11]. Thereafter, IDs were not routinely checked. *Id.*[5]

But, as discussed above, a minor did in fact perform at the Club without age verification in early 2014. [ECF No. 125, ¶ 11]. Thus, as it applies to at least one dancer, Club Madonna did not follow the procedure of checking a performer's ID to verify her age before she began dancing for Club Madonna.

---

[4]     The City disputes this by providing facts in an attempt to show that performers and others hired by Club Madonna should legally be classified as employees under applicable employment law. [ECF No. 125, pp. 4-5]. This does not directly contradict Club Madonna's statements regarding Club Madonna's practices concerning these individuals when they are hired. Regardless, the Undersigned need not determine the legally correct classification of each of Club Madonna's performers and deejays (as employees or independent contractors or some other classification) in order to resolve the questions at issue here.

[5]     The City disputes this by stating that the affiant, Mr. Charles Bailey, who has been employed in a managerial capacity at Club Madonna for six years (as of November 2019, when the affidavit was signed) is unqualified to give testimony regarding the Club's practices before the Ordinance was enacted. [ECF No. 125, ¶ 11]. The Ordinance was enacted in early 2015, thus Mr. Bailey would have been in a managerial capacity approximately two years prior. Thus, he would have had firsthand knowledge of Club Madonna's practices during that time. Further, because he served as compliance officer before and after the enactment of the Ordinance and trained staff to check IDs [ECF No. 114, ¶ 9], he would likely be aware of Club Madonna's practices in this regard prior to the Ordinance being enacted. Regardless, the City does not provide facts that negate Mr. Bailey's sworn statement that this was Club Madonna's policy prior to the Ordinance being enacted (even if it was not always followed in every instance).

Before the Ordinance was enacted, Club Madonna did not ascertain the citizenship status or right to work status of its performers and contractors. *Id.* at ¶ 12. But it was Club Madonna's policy to comply with federal laws relative to citizenship and right to work with respect to those individuals it deems to be its employees (managers, security, waitresses, and bartenders). *Id.*[6]

Under the Ordinance, Club Madonna is required to undertake additional identification and record-keeping requirements relative to its employees, contractors, and performers. *Id.* at ¶ 13. As discussed above, Club Madonna agreed to implement many of the procedures outlined in the Ordinance in advance of the Ordinance taking effect, pursuant to an agreement with the City that allowed Club Madonna to reopen. [ECF Nos. 115-3; 115-7; 115-8; 125, ¶ 13].

In particular, Club Madonna asserts that the Ordinance requires the following:

A. Picture IDs are checked every time an employee or performer enters the establishment, regardless of the age of the performer or the length of time the performer has worked at the Club. Furthermore, Club Madonna understands the Ordinance to require that IDs be checked every time an employee or performer enters the building,

---

[6]     The City disputes this fact, but it merely denies it without providing any support for its blanket denial, other than to say that Club Madonna's affiant is unqualified to make such an assertion. [ECF No. 125, pp. 5-6]. If the City has contrary information supporting that Club Madonna does not comply with federal law relative to citizenship, then it should have provided that information. *See Katchmore Luhrs, LLC*, 2017 WL 432671, at *5. Regardless, this fact is not dispositive to determining the issues here.

causing individuals to be checked multiple times a day if they have occasion to leave the premises and return. [ECF No. 113, ¶ 13].

B. Staff must be trained as to the form of identification that is acceptable as only a limited number of IDs are permissible under the Ordinance. In addition, staff must be reminded to obtain two forms of ID (rather than the single ID previously deemed adequate). *Id.*

C. Daily sign-in logs must be maintained indefinitely. In addition, they must be stored in a format that allows for immediate inspection by City officials at any time. *Id.*

D. Club Madonna must verify that each employee and performer is a U.S. citizen and is authorized to work in the United States (previously that inquiry was limited to employees). *Id.*

E. Club Madonna must verify that an employee or performer is not the subject of human trafficking every time that the individual enters the building, works or provides services to Club Madonna.[7] *Id.*

Club Madonna asserts that these requirements impose a "burden" on Club Madonna, its employees, contractors, and performers. *Id.* at ¶ 14.[8] These include the

---

[7]    The City "disputes" these statements in its response. [ECF No. 125, ¶ 13]. But in actuality, the City does not dispute that the Ordinance requires these additional steps, it merely points out that Club Madonna implemented many of these procedures as a condition of reopening prior to the Ordinance being enacted. *Id.*

[8]    The City disputes that the requirements are burdensome, but it does not provide any evidence to dispute this characterization other than to say that Club Madonna agreed

following requirements:

A. It takes additional time for compliance staff to check the IDs, inquire concerning trafficking and record the interaction. Performers and employees are likewise detained while the inquiry and ID process is taking place. During that time, those performers and employees are not dancing or performing work and services to benefit either themselves or Club Madonna.

B. Club Madonna reports that the process interferes directly with the productivity of Club Madonna's managers, employees, contractors and performers. The cumulative time needed to check the IDs, conduct the necessary inquiry and create and maintain the required records amounts to hours per day, scores of hours per month, and hundreds of hours across the years the Ordinance has been in effect.

C. Club Madonna reports that the record-keeping aspect of the Ordinance is extremely burdensome. The daily dancer and employee sign-in logs must be catalogued and placed into binders for storage. Those binders must be maintained indefinitely. The

_____

to implement these procedures prior to the Ordinance's enactment. [ECF No. 125, ¶ 14]. The fact that Club Madonna agreed to these procedures as part of an agreement to reopen its doors after it was shut down by the City does not contradict that the procedures required under the Ordinance could be characterized as a "burden." The procedures could very well be characterized as a burden when they were first implemented as part of the agreement between the City and Club Madonna, and they continued to be considered by Club Madonna as a burden when they were also required under the Ordinance. However, the Undersigned notes that the objective evidence of what the procedures require and how much time these procedures actually take will control the assessment of whether the procedures are unduly burdensome.

12

binders themselves are large and occupy storage and shelf space at the business. Because those records are subject to inspection at any time, they cannot be warehoused, but must be kept immediately at hand, thereby taking up valuable space which would otherwise be dedicated to ongoing business operations.[9]

While City officials do not check Club Madonna's records frequently at this time, they did so on a weekly and sometimes nightly basis for some months after the Ordinance was enacted. *Id.* at ¶ 14. The City officials did not give prior notice of their inspections, but simply showed up at times of their choosing. *Id.*[10]

## II.   Legal Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a

---

[9]   The City "disputes" this by pointing to an argument that was made by Club Madonna in its response in opposition to the City's motion to dismiss, stating that the Ordinance is not narrowly tailored because it has "nothing to do with human trafficking – it is merely an elaborate record-keeping law which could easily be complied with by a diligent human trafficker." [ECF Nos. 82, pp. 11-12; 125, ¶ 14]. This hyperbolic statement appears to make the point that a human trafficker could easily operate and still be in compliance with the Ordinance if the record-keeping requirements were diligently followed. Club Madonna does not state that the record-keeping portion of the Ordinance is not burdensome. In fact, it describes it as an "*elaborate* record-keeping law." [ECF No. 82, p. 12 (emphasis added)].

[10]   The City disputes this by stating that it conducted inspections pursuant to the agreement to reopen it entered into with Club Madonna, not pursuant to the Ordinance. [ECF No. 125, ¶ 14]. However, this does not contradict Club Madonna's statements regarding the frequency of the visits and that the specific visits were unannounced.

judgment as a matter of law." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (citation omitted). Thus, the Court may enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The moving party must "show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). If the movant does so, then "the burden shift[s] to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Id.* A genuine factual dispute exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1358 (11th Cir. 1999). The opposing party must proffer more than "a mere scintilla of evidence" to show "that the jury could reasonably find for that party." *Abbes v. Embraer Servs., Inc.*, 195 F. App'x 898, 899-900 (11th Cir. 2006) (internal quotations omitted).

When deciding whether summary judgment is appropriate, the Court views all facts and resolves all doubts in favor of the nonmoving party. *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1247 (11th Cir. 2013).

### III.     Analysis

#### A.     Count 7 - Unconstitutional Burden on Speech

Club Madonna seeks summary judgment in its favor declaring that the Ordinance violates the First Amendment because it burdens speech and is not narrowly tailored. According to Club Madonna, the "particular flaws in the Ordinance all center on the unnecessary and repetitive identification requirements and the associated burden of documenting compliance essentially forever." [ECF No. 112, p. 5]. The City argues that the requirements are not burdensome and further are narrowly tailored. [ECF No. 124, pp. 4-7]. As explained below, the Undersigned agrees with Club Madonna that the Ordinance's repeated ID verification is not narrowly tailored.

Nude dancing is considered expressive conduct, which is afforded ***some*** First Amendment protection. *See Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 566 (1991) ("[N]ude dancing . . . is expressive conduct within the outer perimeters of the First Amendment."); *see also Brownell v. City of Rochester*, 190 F. Supp. 2d 472, 488 (W.D.N.Y. 2001) ("[N]on-obscene nude or semi-nude dancing is expressive activity that is protected by the First Amendment.").

Thus, a content-neutral restriction designed to target the secondary effects of nude dancing is subject to intermediate scrutiny, such as the *O'Brien* test. *See Curves, LLC v. Spalding Cty., Ga.*, 685 F.3d 1284, 1289 (11th Cir. 2012) ("A city ordinance prohibiting nude dancing in establishments licensed to sell liquor is content-neutral and therefore, subject

to review under the *O'Brien* test."). The *O'Brien* test requires the following:

> (1) the ordinance is within the constitutional power of the government; (2) it furthers an important or substantial governmental interest; (3) the government interest is unrelated to the suppression of free expression; and (4) the incidental restriction on the alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

*Id.*

Said differently, "a regulation of the ***time, place, or manner*** of protected speech must be narrowly tailored to serve the government's legitimate, content-neutral interests." *Ward v. Rock Against Racism*, 491 U.S. 781, 798-99 (1989) (emphasis added); *see also City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47 (1986) ("'[C]ontent-neutral' time, place, and manner regulations are acceptable so long as they are designed to serve a substantial governmental interest and do not unreasonably limit alternative avenues of communication.").

The *O'Brien* test is substantially similar to the test applied to a regulation of the ***time, place, or manner*** of protected speech. *See Barnes*, 501 U.S. at 566 (noting that "time, place, or manner" test "embod[ies] much the same standards as those set forth in . . . *O'Brien*"). And the Eleventh Circuit applies both standards when deciding the constitutionality of a content-neutral restriction on nude dancing clubs. *See Lady J. Lingerie, Inc. v. City of Jacksonville*, 176 F.3d 1358, 1364-65 (11th Cir. 1999) (applying the *Renton/Ward* test to ordinance regulating the hours of operation of a nude dancing club and buffer zone provisions, which "regulate 'time' and 'place' in the 'time, place, or

16

manner' sense" and they "affect, but do not directly regulate, the expressive conduct that is the basis of the plaintiffs' First Amendment challenges: nude dancing"); *see also Curves*, 685 F.3d at 1289 (applying *O'Brien* test to ordinance prohibiting nude dancing at establishments that sell liquor).

Here, the Ordinance, which is aimed at targeting the secondary effects of nude dancing (human trafficking), regulates the manner that nude dancing clubs may operate in Miami Beach. Thus, the Ordinance is subject to intermediate scrutiny under the *O'Brien* test and/or the "time, place, or manner" test. *See Lady J. Lingerie*, 176 F.3d at 1364-65; *see also Curves*, 685 F.3d at 1289.

Club Madonna agrees with the City that the City has the authority to enact the Ordinance and that it has a substantial government interest in preventing human trafficking. [ECF No. 112, p. 6]. But the parties dispute whether the Ordinance meets the fourth prong of the *O'Brien* test, the "narrow tailoring" requirement, which requires that "the incidental restriction on the alleged First Amendment freedoms [be] no greater than is essential to the furtherance of that interest." *See Curves*, 685 F.3d at 1289.

A regulation is narrowly tailored as long as "the means chosen are not substantially broader than necessary to achieve the government's interest." *Ward*, 491 U.S. at 800. However, it does not impose strict scrutiny's "least restrictive means" requirement and thus the Ordinance "need not be the least restrictive or least intrusive means of doing so." *Daytona Grand, Inc. v. City of Daytona Beach, Fla.*, 490 F.3d 860, 885 (11th Cir. 2007)

(internal citation omitted).

The burden of proof to show that the Ordinance is narrowly tailored is on the City. *See United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 804 (2000) ("When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions."); *Doe v. City of Albuquerque*, 667 F.3d 1111, 1122 (10th Cir. 2012) (emphasis added) ("[T]he ban can survive constitutional scrutiny only if the City, *as the party with the burden of proof*, makes a showing that the ban is narrowly tailored to serve a significant governmental interest and leaves open ample alternative channels of communication.").

Club Madonna argues that the Ordinance is not narrowly tailored because there are readily available alternatives to the Ordinance's requirements that would serve the City's interests equally well without infringing on its First Amendment rights so severely. [ECF No. 112, pp. 7-10]; *see City of Albuquerque*, 667 F.3d at 1134 ("The City provided nothing in the record that could satisfy its obligation of proving that the ban is narrowly tailored. . . Other possible, less restrictive approaches potentially suggest themselves[.]"); *see also Boos v. Berry*, 485 U.S. 312, 329 (1988) ("It may serve an interest in protecting the dignity of foreign missions, but it is not narrowly tailored; a less restrictive alternative is readily available.").

Specifically, Club Madonna suggests that the obvious alternative to requiring Club Madonna to check IDs and maintain the required records every day (which can take

hours per day) is to have an employee, performer, etc., present these items when he or she is first contracted as an entertainer, and then document this with an ID badge featuring his or her image. Club Madonna posits that additional protections against fraud, mistake, or abuse can be achieved by requiring that the identification be resubmitted on an annual basis with an updated picture for the badge.

Club Madonna argues that this is the route taken by "essentially every other community which has imposed age-verification requirements on exotic dancers." [ECF No. 112, p. 8]. Club Madonna points to some examples:

**Jacksonville's Sec. 151.214** provides:

(a) Each commercial establishment which requires a dancing entertainment establishment license under this Chapter, regardless of whether it is licensed or not, shall create, establish, and maintain a record of all performers who work at the establishment, and issue each performer a dance performance permit a copy of which shall be kept and maintained on the dancing entertainment establishment's premises.

The record for each performer shall contain the following information:

(1) The performer's full legal name,
(2) Any stage names used by the performer;
(3) The performer's residential address;
(4) A clear copy of the performer's driver's license or equivalent photograph identification, such as a state identification card or military identification; and
(5) A copy of the performer's dance performance permit.

[ECF No. 112-2, p. 1].

**Brevard County's Sec. 62-4991** provides:

(a) An adult entertainment establishment shall maintain an employee

record for each employee who currently works or performs at the establishment, and for each employee who works at the establishment during the preceding one-year period.

(1) The employee record shall contain the current or former employee's full legal name, any aliases, and date of birth.
. . .
(c) Each operator of the establishment shall, upon request by a law enforcement officer or code enforcement officer, when the establishment is open for business, immediately make available for inspection the original, or the true and exact photocopies thereof, of any employee record.

*Id.* at p. 2.

**Gainesville's Sec. 14.5-77** provides:

(a) An adult performance establishment or escort service shall maintain a record of all employees who currently work for or perform at the business, and of all former employees who worked for or performed at the business during the preceding one-year period. The record shall contain the current or former employee's full legal name, including any aliases, date of birth, and a recent photograph of the employee.
. . .
(d) An operator of the licensed business shall, upon request by a law enforcement or code enforcement officer when the business is open, immediately make available for inspection the original records, or the true and exact photocopies thereof.

*Id.* at p. 3.

**Bay County's Sec. 3.5-78** provides:

(a) Sexually oriented business permit required. Unless specifically excluded below, it shall be unlawful for any person to work in a sexually oriented business, for any form of consideration, unless and until such person shall have first obtained a sexually oriented business permit or temporary permit from the county sheriff's department. . . .

(b) Qualifications. Any individual required to obtain a permit under this subdivision shall not be less than 18 years of age and shall not have been

convicted of a Specified Criminal Act, as defined herein.

. . .

*Id.* at pp. 4-7.

Unlike the Ordinance here, none of these ordinances require adult nightclubs to verify the age and employment status of a dancer or any other employee every single time he or she comes to work. Rather, the ordinances require that adult entertainment clubs maintain a record of its dancers reflecting that they meet age requirements.[11] The Undersigned does not find this to be *dispositive*. However, it does provide support for Club Madonna's argument that the City likely did not consider (or adequately consider) less-burdensome alternatives in enacting the Ordinance.

The City's response is that the Ordinance's ID checking requirements and record-keeping requirements are "not at all burdensome." [ECF No. 124, p. 5]. Other than to say that Club Madonna's statements are "self-serving" [ECF No. 124, p. 4], the City does not provide evidence that contradicts Club Madonna's statement that it takes ***hours*** a day to comply with the Ordinance's requirements.[12] [ECF No. 113, ¶ 14, b]. The Undersigned

---

[11]    The Undersigned does agree with the City that Bay County's ordinance is more restrictive in one way because it requires that the dancer register with the sheriff's office. However, it does not require an adult entertainment club to review its dancers' identities through two forms of ID every time they enter the building.

[12]    The City also argues that the Ordinance is not burdensome because Club Madonna agreed to implement many of these procedures in order to reopen its doors after being closed down by the City. Again, this precedent-free theory does not support the argument that the process is not burdensome. It could be burdensome when it was initiated to comply with the agreement with the City (in order to open its doors for business on an expedited basis and *continued* to be burdensome under the Ordinance).

does not find that Club Madonna's statements regarding the burden to be implausible and merely self-serving. Even if the process is done quickly, it is conceivable that checking two forms of ID, copying these two forms of ID, and verifying that the dancer is not subject to human trafficking would take at least five minutes a person. If Club Madonna has to conduct this process for 25 people in a day (performers, deejays, bartenders, waitresses, bouncers, etc.),[13] then the process would take at least two hours a day.

Regardless of whether the City views this to be burdensome, it cannot be disputed that requiring Club Madonna to verify the age and employment status of its dancers, deejays, bartenders, and others every time they come to work is more burdensome than requiring Club Madonna to do this on a semi-annual or annual basis. The question becomes whether this increased burden is "greater than is essential to the furtherance of that interest." *See Curves*, 685 F.3d at 1289.

The City claims that using an ID badge system would be "easily circumvented" and "a Club employee could just as easily create a Club ID for an underage dancer that would allow her unlimited ingress or egress because under the policy, she would never have to show ID again." [ECF No. 124, pp. 6-7]. The Undersigned disagrees. Under an ID badge system, the performer would be required to furnish two forms of ID when hired,

---

The City points to no authority supporting the theory that this initial agreement makes the requirements somehow less burdensome.

[13]     Sign-in sheets from Club Madonna reflect 10-21 performers on each shift and 5-8 employees and deejays per shift. [ECF No. 115-10]. The City does not dispute this.

which would be verified and copied for record-keeping by Club Madonna. On a semi-annual or annual basis, the performer would be required to furnish her two forms of ID again to Club Madonna for copying and record-keeping and she would take an updated picture for her badge.

It is true that a Club Madonna employee could theoretically flout these requirements and create an ID badge anyway, but then Club Madonna would not have the required copies of the dancer's IDs, and the City would discover this when reviewing the required records. And a Club Madonna employee could just as easily flout the requirements of the current Ordinance and allow a dancer to perform anyway without verifying her age.

Thus, it does not appear that the repeated ID verification process furthers the City's interest in any meaningful way. Arguably, repeatedly requiring a dancer to furnish two forms of ID may discourage her from providing fake IDs because she has to provide them every time she comes to work, or alternatively, may prevent an employee at Club Madonna from committing any type of fraud. But this is speculative at best, and the City has not provided any *evidence* supporting this theory. And the reverse could also be true: that requiring Club Madonna to check this information every day could result in a haphazard check in an effort to save time.

Accordingly, because the Ordinance ignores (or does not use) far-less restrictive and precise means, the Undersigned finds that the repeated ID verification (for age and

employment eligibility) is not narrowly tailored, and thus burdens speech in violation of the First Amendment. *See FF Cosmetics FL, Inc. v. City of Miami Beach*, 866 F.3d 1290, 1301 (11th Cir. 2017) ("By ignoring far less restrictive and precise means, it is likely that an ordinance burdens substantially more speech than necessary.").

However, the Undersigned finds that the City does further its interest in preventing human trafficking by verifying with its dancers, ***on a repeated basis*** (e.g., monthly, but not every time they enter the building), that they are not victims of human trafficking and are working on their own accord. Unlike a dancer's age, her circumstances could change from month to month, and she could find herself in a scenario where she is not working on her own accord.

Similarly, the Undersigned does not find the **record-keeping requirements** to be overly burdensome, especially if Club Madonna is only copying and retaining a dancer's two forms of identification on a semi-annual or annual basis. Similar record-keeping requirements were included in the other ordinances provided by Club Madonna as examples of less restrictive ordinances, and thus it does not appear that the City "ignor[ed] far less restrictive and precise means." *See FF Cosmetics FL, Inc.*, 866 F.3d at 1301.[14]

---

[14] These considerations would also apply to the check in/check out procedure. Thus, the check in/check out procedure would permissibly require clubs to maintain a check in/check out procedure to note what dancer performed and whether, for example, the ID badge was checked, but not that the two forms of ID were verified, because that requirement is not narrowly tailored.

B.      **Count 13 – Preemption by Federal Immigration Law**

Club Madonna argues that the Ordinance's requirement that adult entertainment clubs verify the employment eligibility of all workers (including independent contractors) is expressly preempted and conflict preempted by federal immigration law. [ECF No. 1, ¶ 272]. Specifically, Club Madonna points to the following provision of the Ordinance:

> All nude dance establishments as defined in section 142-1271 of the city Code, and as such section may be amended from time to time, must:
>
> (1) Require any worker or performer entering the nude dance establishment to provide proof of an original, lawfully issued state or federal photo identification, and one additional form of identification that confirms he or she is:
>
> . . .
>
> (b) *Is either a U.S. Citizen, legal resident, or otherwise legally permitted to be employed within the United States of America*.

[ECF No. 1-2, § 18-913(1)].

Club Madonna is subject to the following penalties if it does not verify the required citizenship/residency documents: "(1) First offense within a 12-month period must be a fine of $5,000.00; (2) Second offense within a three-year period must be a fine of $10,000.00; (3) Third offense and subsequent offenses within a five-year period must be a fine of $20,000.00." *Id.* at § 18-915.

As discussed below, the Undersigned finds the Ordinance's employment eligibility verification for all workers to be in conflict with the objectives of federal immigration law, which purposefully exclude independent contractors and other casual

hires from employment verification requirements. Thus, the Undersigned finds that the Ordinance is **conflict preempted**.

"[T]he Supremacy Clause provides a clear rule that federal law 'shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any state to the Contrary notwithstanding.'" *Ariz. v. United States*, 567 U.S. 387, 399 (2012) (citing Art. VI, cl. 2.). Under the Supremacy Clause, Congress has the power to preempt state and local laws when they conflict with federal law. *Id.*

Federal law can preempt state law through express preemption, field preemption, and conflict preemption. *Arizona v. United States*, 567 U.S. 387, 399 (2012). Express preemption occurs when "Congress withdraw[s] specified powers from the States by enacting a statute containing an express preemption provision." *Id.* Field preemption occurs when Congress regulates conduct in a field that it has determined must be regulated by its exclusive governance. *Id.* "Conflict preemption occurs either when it is physically impossible to comply with both the federal and the state laws or when the state law stands as an obstacle to the objective of the federal law." *Fla. State Conference of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1167 (11th Cir. 2008).

Here, Club Madonna argues that the Ordinance is expressly preempted by the Immigration Reform and Control Act of 1986 ("IRCA"), and is conflict preempted by the

objectives of federal immigration law -- that independent contractors and other causal hires be excluded from verification requirements.

    **1.**    *Express Preemption*

The IRCA makes it unlawful for any person or entity to hire an unauthorized alien as an employee. 8 U.S.C. § 1324a. The IRCA also "restricts the ability of States [and local governments] to combat employment of unauthorized workers." *Chamber of Commerce of U.S. v. Whiting*, 563 U.S. 582, 590 (2011). The IRCA "***expressly preempts*** 'any State or local law imposing civil or criminal sanctions (other than through licensing and similar laws) upon those who employ, or recruit or refer for a fee for employment, unauthorized aliens.'" *Id.* (citing § 1324a(h)(2)) (emphasis added).

Thus, unless the Ordinance is a licensing or similar law, the Ordinance would be expressly preempted by the IRCA if it is found to impose civil sanctions upon those who employ, or recruit or refer for a fee for employment, unauthorized aliens.

Because the Undersigned finds that the Ordinance is conflict preempted, the Undersigned need not discuss in detail whether the Ordinance is also expressly preempted. Nevertheless, the Undersigned notes that the Ordinance does not appear to be expressly preempted.  The Ordinance does not penalize the ***hiring*** of an independent contractor who is an unauthorized alien, but, rather penalizes adult entertainment clubs for not ***verifying*** workers' employment eligibility. *See Edmondson*, 594 F.3d at 766 (finding that provision which penalized entities for not ***verifying*** the work authorization status of

all their workers (as opposed to penalizing them for *hiring*) was not expressly preempted).

> ### 2.   *Conflict Preemption*

Congress purposefully excluded independent contractors and other non-employees from the scope of the restrictions contained in the IRCA. *See* 8 U.S.C. §1324a.(a)(1)(A); *see Chamber of Commerce of U.S. v. Edmondson*, 594 F.3d 742, 769 (10th Cir. 2010) (stating Congress has "intentionally excluded independent contractors from verification obligations"); *see also Lozano v. City of Hazleton*, 724 F.3d 297, 306 (3d Cir. 2013) (citing H.R.Rep. No. 99–682(1), at 57, 1986 U.S.C.C.A.N. 5649, 5661) ("Congress explicitly declined to sanction employers based on the work authorization status of 'casual hires (i.e., those that do not involve the existence of an employer/employee relationship).'").

Congress did so in order to "minimize the burden placed on employers." *Lozano*, 724 F.3d at 306; *see also Edmondson*, 594 F.3d at 768 ("Employers are not required to verify the work eligibility of independent contractors, which would increase the burdens on business and could lead to increased employment discrimination.").

Accordingly, Club Madonna argues that, by not limiting the work eligibility verification to only employees, the Ordinance conflicts with Congress's intent to exclude independent contractors and other casual hires from employment verification requirements and is thus conflict preempted.

The Eleventh Circuit has not addressed whether a local or state requirement that businesses *verify* the legal status of all workers, including independent contractors, is conflict preempted. But other Circuits have addressed challenges to similar requirements and found that they **do** conflict with the objectives of federal immigration law and are therefore conflict preempted. *See Lozano*, 724 F.3d at 307, 309 (finding that statutory scheme requiring that employer "verify the status of independent contractors and casual hires . . . conflicts with Congress's intent to limit IRCA's application to the employer/employee relationship" and is preempted); *see also Edmondson*, 594 F.3d at 750 (finding Oklahoma statutory requirement that "contracting entities either verify the work eligibility of their individual independent contractors or withhold certain taxes from those contractors . . . interferes with Congress' chosen methods and is thus conflict preempted").

For example, in *Edmondson*, the Tenth Circuit considered challenges to an Oklahoma statute regulating illegal immigration and verification of employment eligibility. *Edmondson*, 594 F.3d at 750. Relevant to the discussion here is Section 9 of the Oklahoma statute, which "require[d] contracting entities either to verify the work eligibility of their individual independent contractors or withhold certain taxes from those contractors. Otherwise, the contracting entity [was] liable to the State for the money not withheld." *Id.*

Various chambers of commerce and trade associations argued that Section 9, among other provisions, was expressly and conflict preempted by federal immigration law and moved for a preliminary injunction to bar Oklahoma from enforcing the challenged provisions. *Id.* The district court granted the plaintiffs' motion for preliminary injunction. *Id.* Oklahoma officials appealed the order granting plaintiffs' motion for preliminary injunction. *Id.*

On appeal, the Court first found that the plaintiffs were unlikely to succeed on the merits of their claim that Section 9 was expressly preempted by the IRCA because it did not impose civil or criminal sanctions for ***recruiting or hiring*** unauthorized aliens. *Id.* at 766. Rather, Section 9 penalized entities for not ***verifying*** the work authorization status of all their workers, including independent contractors. *Id.*

However, the Court found that "plaintiffs w[ould] likely succeed in their argument that [Section 9] interferes with Congress' chosen methods and is thus conflict preempted." *Id.* at 767. The Court noted that federal law "defines the class of individuals who must verify employment eligibility, requiring verification for employees but not for independent contractors." *Id.* at 751 (citing § 1324a(a)(1)(A); 8 C.F.R. § 274a.1(f) (excluding "independent contractor" from the definition of "employee"); and 8 C.F.R. § 274a.1(g) (stating employers not responsible for verifying work authorization of independent contractors)).

The Court further explained:

> **[Section 9] would require contracting entities, on pain of burdensome withholding requirements or penalties, to verify the work authorization status of independent contractors. Congress, by contrast, intentionally excluded independent contractors from verification obligations**. *See* 8 U.S.C. § 1324a(a)(1)(A); 8 C.F.R. § 274a.1(f), (g); H.R.Rep. No. 99–682(I), at 57. By requiring verification of independent contractors, Oklahoma risks exposing contracting entities to liability under federal law. *See* 8 U.S.C. § 1324b(a)(6), (b). Although a business must act with the specific intent to discriminate to be liable under federal law, § 1324b(a)(6), it is likely that a contracting entity will face increased claims of unfair employment practices as a result of the enhanced obligations Section 9 would impose.
>
> . . .
>
> **Section 9 would create obligations on contracting entities that Congress expressly chose not to impose**. *See* 8 U.S.C. § 1324a(a)(1)(A); 8 C.F.R. § 274a.1(f), (g); H.R.Rep. No. 99–682(I), at 57; *cf. Geier*, 529 U.S. at 881, 120 S. Ct. 1913. Just as state tort law could not require airbag installation when the federal government had balanced competing interests and decided against such a requirement, *Geier*, 529 U.S. at 877–78, 120 S. Ct. 1913, neither can Oklahoma's statutory law require verification of independent contractors when Congress plainly chose not to do so.

*Id*. at 769-70 (emphasis added).

Similarly, in *Lozano*, the Third Circuit held that a provision which restricted businesses from hiring any person who is an unlawful worker, including independent contractors, to be conflict preempted by the IRCA. *Lozano*, 724 F.3d at 307. The City of Hazelton previously appealed the district court's judgment permanently enjoining enforcement of this provision, along with other portions of a bigger statutory scheme relating to the employment and housing of unauthorized aliens. *Id.* at 300. The Third Circuit upheld the permanent injunction. *Id.* The Supreme Court granted the City's petition for a writ of certiorari and remanded the case so that the Third Circuit would

reconsider its analysis in light of a recent decision, *Chamber of Commerce of U.S. v. Whiting*, 563 U.S. 582 (2011) (discussed further below). *Id.*

On remand, the Third Circuit again held that the provision, titled "Section 4," among other provisions, was conflict preempted by the IRCA. *Id.* The Court noted that, "in sharp contrast" to Section 4, "the federal prohibition in IRCA reaches only hiring or recruiting or referring for a fee, *for employment* in the United States." *Id.* at 306 (internal citation omitted).

The Court further explained:

In striking the intricate balance that lead to the enactment of IRCA, Congress deliberately excluded independent contractors and other non-employees from the scope of the restrictions contained in the statute. *Arizona*, 132 S. Ct. at 2504. ("Congress enacted IRCA as a comprehensive framework for 'combating the employment of illegal aliens.'") (emphasis added) (quoting *Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137, 147, 122 S. Ct. 1275, 152 L.Ed.2d 271 (2002)). As we explained previously:

> In drafting IRCA, Congress explicitly declined to sanction employers based on the work authorization status of "casual hires (i.e., those that do not involve the existence of an employer/employee relationship)." H.R.Rep. No. 99–682(1), [at 57], 1986 U.S.C.C.A.N. 5649, 5661. This was not an unreasoned choice, but part of the crafting of the statute to minimize the burden placed on employers. As the court explained in [*Chamber of Commerce of U.S. v.*] *Edmondson*, "[e]mployers are not required [under federal law] to verify the work eligibility of independent contractors" because it "would increase the burdens on business." 594 F.3d [742] at 767 [(10th Cir. 2010)]. Businesses utilize independent contractors, in part, to reduce the costs and liabilities associated with procuring labor when an enduring and structured relationship is not needed. **Compelling businesses to concern themselves with the work**

> **authorization status of contractors alters this relationship, and also raises costs.**

*Lozano II*, 620 F.3d at 216–17 (alterations in original).

. . .

> **Given the intricate framework of IRCA, we cannot assume that the distinction is immaterial. Rather, it appears to be a deliberate distinction that Congress included as part of the balance it struck in determining the scope and impact of IRCA's employer sanctions. However, Hazleton's ordinance does not distinguish between employees, on the one hand, and independent contractors or casual hires, on the other**.

*Id.* at 306-07. Thus, the Court found that Section 4 "conflicts with Congress's intent to limit IRCA's application to the employer/employee relationship," and was thus conflict preempted. *Id.* at 309.

Here, the Ordinance requires that Club Madonna ***verify*** the work eligibility of **<u>all</u>** of its workers and performers, not just those individuals who are in an employer/employee relationship with Club Madonna. *See* ECF No. 1-2, § 18-913(1) (requiring "***any worker or performer***" entering the establishment provide proof confirming he or she "is either a U.S. Citizen, legal resident, or otherwise legally permitted to be employed within the United States of America").[15]

This is very similar to the challenged provision in *Edmondson*, which required businesses to ***verify*** the work eligibility of all workers, including independent

---

[15]    The City asserts that Club Madonna's dancers should be categorized as employees and not independent contractors or other casual hires. This is irrelevant to Club Madonna's facial challenge. As noted by the Eleventh Circuit, "[f]urther factual development cannot assist in resolution of these facial challenges, which raise purely legal issues." [ECF No. 74, p. 17].

contractors. *Edmondson*, 594 F.3d at 750. The Undersigned agrees with the reasoning of the Tenth Circuit in *Edmondson* and the Third Circuit in *Lozano* that a local ordinance requiring businesses to verify the work eligibility of all workers, including independent contractors and casual hires, conflicts with Congress's intent to exclude independent contractors and other casual hires from work eligibility verification requirements. *See Edmondson*, 594 F.3d at 750; *see also Lozano*, 724 F.3d at 307, 309.

The Undersigned is not convinced by the City's argument that the Ordinance here can be adequately distinguished from the challenged regulations in *Lozano* and *Edmundson* because those regulations were enacted for the ***purpose*** of preventing the hiring of unauthorized aliens; whereas here, the City enacted the Ordinance with the purpose of preventing human trafficking. The City's purpose in enacting the Ordinance is irrelevant because the Ordinance still requires verification of the eligibility of all workers, including independent contractors and other casual hires, which conflicts with Congress's intent to limit the IRCA's application to the employer/employee relationship. The City has not provided any case law supporting the notion that a municipality's *intent* to not conflict with federal objectives will save an otherwise conflict preempted ordinance. Likewise, the City has not presented the Court with any persuasive authority that a more-noble purpose (i.e., preventing human trafficking, as opposed to the preventing the hiring of unauthorized aliens) can somehow save local legislation otherwise invalid because of conflict preemption.

To be sure, the Undersigned agrees with the City that there is nothing to support the view that Congress, in enacting the IRCA, intended to prevent local governments from verifying that nude dancers are not in this country against their will. However, the Ordinance goes beyond that and requires that adult entertainment clubs verify the citizenship/legal residency of all their dancers and other workers. The City has not provided any support for an argument that there is an exception to conflict preemption for ordinances aimed at curbing human trafficking.

Finally, the Undersigned disagrees with the City that the Ordinance is similar to the law considered in *Whiting* found to not be expressly preempted or conflict preempted. In *Whiting*, the Supreme Court considered an Arizona law providing that the licenses of state employers who knowingly or intentionally ***employed*** unauthorized aliens could be suspended or revoked. *Chamber of Commerce of U.S. v. Whiting*, 563 U.S. 582, 587 (2011).

First, the Supreme Court found that the law was not expressly preempted by the IRCA. The "IRCA expressly preempts States from imposing 'civil or criminal sanctions' on those who employ unauthorized aliens, 'other than through licensing and similar laws.'" *Id.* at 594-95 (quoting 8 U.S.C. § 1324a(h)(2)). However, the Court found that Arizona's law was a licensing or similar law and thus it met the IRCA's savings clause and was not expressly preempted. *Id.* at 599.

Next, the Court considered whether Arizona's law was impliedly preempted for conflicting with federal law. *Id.* The Court found that Arizona's law did not conflict with

federal law because it "closely track[ed] IRCA's provisions in all material respects." *Id.* at

601. The Court noted:

> From this basic starting point, the Arizona law continues to trace the federal
> law. Both the state and federal law prohibit "knowingly" employing an
> unauthorized alien. Compare 8 U.S.C. § 1324a(a)(1)(A) with Ariz. Rev. Stat.
> Ann. § 23–212(A). But the state law does not stop there in guarding against
> any conflict with the federal law. The Arizona law provides that
> "'[k]nowingly employ an unauthorized alien' means the actions described
> in 8 United States Code § 1324a," and that the "term shall be interpreted
> consistently with 8 United States Code § 1324a and any applicable federal
> rules and regulations." § 23–211(8).

*Id.* at 602-03.[16]

This is unlike the Ordinance here, which does not track the language of the IRCA

and conflicts with Congress's purposeful exclusion of independent contractors and other

casual hires from verification requirements. If, alternatively, the City had limited the

eligibility requirements to just employees, then the Ordinance might not be preempted.[17]

---

[16]    The Court in *Whiting* also considered whether Arizona's mandated use of E-Verify
(an internet-based system that allows employers to verify an employee's work
authorization status) conflicted with federal objectives. *Id.* at 608. The Court found that it
was "entirely consistent with . . . federal law" and "Congress's objective in authorizing
the development of E–Verify was to ensure reliability in employment authorization
verification, combat counterfeiting of identity documents, and protect employee privacy.
8 U.S.C. § 1324a(d)(2). Arizona's requirement that employers operating within its borders
use E–Verify in no way obstructs achieving those aims." *Id.*

[17]    But this potential result in a hypothetical scenario still might not be sufficient to
save even the hypothetical ordinance proffered here. Even if the verification
requirements applied only to employees, the Ordinance arguably imposes additional
penalties atop federal law for immigration hiring practices violations. *See Ga. Latino All.
for Human Rights v. Governor of Ga.*, 691 F.3d 1250, 1267 (11th Cir. 2012) (finding a
likelihood of success on the merits of argument that Georgia law imposing additional

C.     **Count 16 – Fourth Amendment Restriction on Warrantless Administrative Searches and Seizures**

Club Madonna argues that the Ordinance is facially invalid under the Fourth Amendment because it allows the City to conduct warrantless administrative searches of its records at any time. Specifically, the Ordinance provides that "[t]he documents referenced in subsections (1) through (5) [verifying the age and legal work status for workers and performers] must be available for inspection by the city **upon demand**, and the nude dance establishment shall not refuse access to these documents for inspection by the city." [ECF No. 1-2, p. 2 (emphasis added)].

Under the Fourth Amendment, "searches conducted outside the judicial process, without prior approval by a judge or a magistrate judge, are per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions." *City of Los Angeles, Calif. v. Patel*, 135 S. Ct. 2443, 2452 (2015) (internal citation omitted). This rule

_____

penalties atop federal law for harboring an illegal alien conflicted with federal law); *see also Arizona v. United States*, 567 U.S. 387, 402-03 (2012) (finding a "further intrusion upon the federal scheme" where "there is an inconsistency . . . with respect to penalties"); *Wisconsin Dep't of Indus., Labor & Human Relations v. Gould Inc.*, 475 U.S. 282, 286 (1986) (internal citation omitted) ("Conflict is imminent whenever two separate remedies are brought to bear on the same activity.").

Additionally, as pointed out by Club Madonna, the Ordinance does not allow some forms of identification which are authorized by the IRCA. *See Edmondson*, 594 F.3d at 751 ("IRCA establishes a list of permissible verification documents, enabling employees to prove eligibility by supplying any document on the list."); *see also* 8 U.S.C. § 1324a(b)(1)(A)-(b)(1)(D).

applies to commercial locations, as well as to homes. *Id.* However, "administrative searches," such as those necessary to ensure compliance with record-keeping requirements, are permissible. *Id.*

"[I]n order for an administrative search to be constitutional, the subject of the search must be afforded an opportunity to obtain precompliance review before a neutral decisionmaker." *Id.* For example, if a business refused an administrative search of its records, the business owner "must be afforded an opportunity to have a neutral decisionmaker review an officer's demand to search the [records] before he or she faces penalties for failing to comply." *Id.* at 2453. The "availability of precompliance review alters the dynamic between the officer and the [business] to be searched, and reduces the risk that officers will use these administrative searches as a pretext to harass business owners." *Id.* at 2454.

Here, the Ordinance does not provide any opportunity for pre-compliance review before a neutral decisionmaker and thus would not satisfy the Fourth Amendment. *See* ECF No. 1-2.

However, a more-relaxed standard (not requiring pre-compliance review) applies to businesses in a "closely regulated" industry. *See Patel*, 135 S. Ct. at 1254. The City argues that adult entertainment clubs, like Club Madonna, are closely regulated and thus the more-relaxed standard applies to the Ordinance here.

The Supreme Court has identified four industries that are closely regulated -- liquor sales, firearms dealing, mining, or operating an automobile junkyard. *Id.* (internal citation omitted) ("Over the past 45 years, the Court has identified only four industries that 'have such a history of government oversight that no reasonable expectation of privacy . . . could exist for a proprietor over the stock of such an enterprise.'"). However, lower courts have found other industries to be "closely regulated." *See id.* at 2461 (Scalia, J., dissenting) (collecting cases); *see also United States v. Kolokouris*, No. 12-CR-6015G, 2015 WL 4910636, at *20 (W.D.N.Y. Aug. 14, 2015) (collecting cases).

"There is no clearly defined test used to determine whether a particular business is closely regulated." *Kolokouris*, 2015 WL 4910636, at *20-21 (noting difficulty in determining whether a business is "closely regulated" for purposes of administrative searches). The pervasiveness of government regulation and duration of regulation "is informative, although not dispositive." *Id.* at *20; *see New York v. Burger*, 482 U.S. 691, 705, (1987) (internal citation omitted) (stating that in determining what constitutes a "closely regulated" industry, "the duration of th[e] particular regulatory scheme, has some relevancy").

Nude dancing clubs have been historically heavily regulated. *See City of Erie v. Pap's A.M.*, 529 U.S. 277, 299, 302 (2000) (upholding ordinance barring full nudity at nude dancing club); *see also Flanigan's Enters., Inc. of Ga. v. Fulton Cty., Ga.*, 596 F.3d 1265, 1269 (11th Cir. 2010) (upholding ordinance barring the sale of alcohol at adult entertainment

establishments); *FW/PBS, Inc. v. City of Dallas*, 837 F.2d 1298, 1306 (5th Cir. 1988), aff'd in part, vacated in part on other grounds, 493 U.S. 215 (1990) ("Communities long have been concerned about the effects of sexually oriented businesses and have attempted to cope with those effects through regulation.").

Some courts have found sexually-oriented businesses to be closely regulated. *See, e.g., FW/PBS, Inc.*, 837 F.2d at 1306 (finding more relaxed standard under Fourth Amendment applied for sexually-oriented businesses); *see also WBY, Inc. v. DeKalb County, Georgia*, 766 F. App'x 852, 858 (11th Cir. 2019) ("All here agree that adult-entertainment clubs are 'closely regulated' industries.").

Other courts do not find sexually oriented businesses to be "closely regulated." *See Free Speech Coal., Inc. v. Attorney Gen.*, 825 F.3d 149, 170 (3d Cir. 2016) (emphasis added) ("The pornography industry . . . is not subjected to a level of regulation even approximating the pervasive regulation aimed at the liquor industry . . . firearms dealing . . . mining, [and] . . . independent automobile junkyards."); *see also J.L. Spoons, Inc. v. City of Brunswick*, 49 F. Supp. 2d 1032, 1040 (N.D. Ohio 1999) ("[S]exually oriented businesses do not qualify as highly regulated industries . . . Indeed, because sexually oriented businesses enjoy a degree of First Amendment protection, the government probably could not 'closely regulate' them under the *Burger* line of cases without running afoul of the First Amendment").

In an unpublished Eleventh Circuit opinion, *WBY, Inc. v. DeKalb County, Georgia*,

766 F. App'x 852, 858 (11th Cir. 2019), the Court considered whether a warrantless administrative search of an adult entertainment club, "Follies," violated the Fourth Amendment. In doing so, the Court stated "[a]ll here agree that **adult-entertainment clubs are 'closely regulated' industries**." *Id.* (emphasis added); *see also WBY, Inc. v. City of Chamblee, Georgia*, No. 1:18-CV-02739-SDG, 2020 WL 1809746, at *5 (N.D. Ga. Jan. 16, 2020) (when discussing an unrelated administrative search, the district court referenced the Eleventh Circuit's finding: "The Eleventh Circuit recently held, and the parties do not dispute, that Follies is an adult entertainment club engaging in a 'closely regulated' industry."). However, it is unclear whether this determination had anything to do with the fact that Follies served alcohol at its club. *WBY, Inc.*, 766 F. App'x at 854 (noting Follies served alcohol at its adult entertainment club).

Thus, there is not any directly-on-point, crystal-clear controlling authority holding that adult entertainment clubs (including those that **don't** serve alcohol) are "closely regulated." But if confronted with the issue, it appears the Eleventh Circuit would find that adult entertainment clubs are "closely regulated." And it is clear that adult entertainment clubs have historically been heavily regulated. *See, e.g., Pap's A.M.*, 529 U.S. at 299, 302; *Flanigan's Enters., Inc. of Ga.*, 596 F.3d at 1269; *FW/PBS, Inc.*, 837 F.2d at 1306.

Therefore, the Undersigned will apply the more-relaxed standard here. But this determination (i.e., a prediction of how the Eleventh Circuit Court of Appeals would rule) that adult entertainment clubs are "closely regulated" is still not dispositive here because

the City has also not met the more-relaxed standard.

Under the relaxed standard for closely regulated businesses, the Ordinance would need to satisfy the following criteria:

> (1) "[T]here must be a 'substantial' government interest that informs the regulatory scheme pursuant to which the inspection is made"; (2) "the warrantless inspections must be 'necessary' to further [the] regulatory scheme"; and (3) "the statute's inspection program, in terms of the certainty and regularity of its application, [must] provid[e] a constitutionally adequate substitute for a warrant."

*Patel*, 135 S. Ct. at 2456 (citing *N.Y. v. Burger*, 482 U.S. 691, 702 (1987)).

As to the first requirement, the Undersigned finds (and Club Madonna agrees) that the City has a substantial government interest in curtailing human trafficking and in ensuring that Club Madonna maintains accurate and complete records verifying the age of its employees and performers and that they are not working against their will.

As to the second requirement, the Undersigned is not convinced that warrantless surprise inspections are necessary to further the efficacy of the Ordinance's document-keeping requirements. The Ordinance requires that Club Madonna maintain identification documents confirming that all its workers and performers are over the age of eighteen and are legally eligible to work in the United States, that they are not working against their will, verification from an owner that the information is accurate, and a check-in sheet. These items must be "available for inspection by the city upon demand, and the nude dance establishment shall not refuse access to these documents for inspection by the city." [ECF No. 1-2, p. 2].

Thus, the Ordinance does not require that the City verify the accuracy of this information onsite (i.e., whether the dancers on shift are actually over the age of 18 and not working against their will). Rather, it requires only that adult entertainments clubs *present* the required records. *See* ECF No. 116, pp. 19-20 (stating the Ordinance's inspections "involve access only to records created pursuant to the Ordinance" and "the inspector need only step a few feet inside the front door"). Therefore, the City's argument that surprise inspections are necessary to prevent Club Madonna from falsifying documents is unconvincing. Club Madonna could falsify the records it keeps pursuant to the Ordinance anytime.

The City (and/or law enforcement agencies) can always obtain the equivalent of a surprise inspection by seeking an *ex parte* warrant if there is probable cause to believe that Club Madonna is falsifying records and that its performers and other workers are actually underage and/or working against their will. *See Patel*, 135 S. Ct. at 2456 ("[N]othing in our decision today precludes an officer from conducting a surprise inspection by obtaining an *ex parte* warrant or, where an officer reasonably suspects the registry would be altered, from guarding the registry pending a hearing on a motion to quash.").[18]

---

[18]    The City points to Club Madonna's alleged non-compliance with record-keeping requirements in support of its argument that surprise inspections are necessary. But again, Club Madonna (and any other adult entertainment club) can falsify the records anytime. Further, Club Madonna has waged a facial challenge against the ordinance, not a challenge to its application against Club Madonna. Thus, the Ordinance's application here is irrelevant, including whether Club Madonna initially consented to the inspections pursuant to the parties' agreement to allow Club Madonna to reopen. *See* ECF No. 74, pp.

Further, this is unlike the surprise inspections found permissible in *Crosby v. Paulk*, 187 F.3d 1339, 1347 (11th Cir. 1999), which were used to find evidence of underage sales of alcohol to minors, who must be "caught in the act" because otherwise the evidence of alcohol consumption is lost.[19] This is also unlike surprise inspections of junkyards. *See New York v. Burger*, 482 U.S. 691, 710 (1987) ("Because stolen cars and parts often pass quickly through an automobile junkyard, 'frequent' and 'unannounced' inspections are necessary in order to detect them."). Here, the City is merely inspecting records. This can be done anytime, and the purpose will not be meaningless if it is not done by a surprise inspection.

And lastly, the Undersigned finds that the Ordinance is also deficient under the "certainty and regularity" requirement because it does not provide a constitutionally adequate substitute for a warrant. *See Patel*, 135 S. Ct. at 2456 (citing *Burger*, 482 U.S. at 702) ("[T]he statute's inspection program, in terms of the certainty and regularity of its application, [must] provid[e] a constitutionally adequate substitute for a warrant.").

---

16-17 (stating Count 16, arguing warrantless search and seizure under Fourth Amendment, "presents purely legal questions"); *see also Patel*, 576 U.S. at 409 ("[F]acial challenges under the Fourth Amendment are not categorically barred or especially disfavored.").

[19]      Thus, arguably, if the Ordinance provided for an inspection to verify all performers' and patrons' ages by checking IDs, this would require surprise inspections. However, that is not what the Ordinance's inspection requirements call for here.

The City is correct that the Ordinance limits the specific documents that are to be inspected -- those identified in subsections (1) through (5). But there is no temporal limitation on when or how often the City (code enforcement officials or police officers) can inspect Club Madonna's records, which must be kept onsite. This is problematic. *See Patel*, 135 S. Ct. at 2456 (finding ordinance "was constitutionally deficient under the 'certainty and regularity' prong . . . because it fails sufficiently to constrain policy officers' discretion" where there was no limitation on what hotels would be searched and how often they would be searched).

However, the Undersigned notes that it would be an easy fix for the City to include some perimeters regarding when and how often the inspections will be conducted (i.e., "on a regular basis" and conducted "during regular business hours"). *See Burger*, 482 U.S. at 711 (finding ordinance permissible that provided for inspections on a "regular basis" during "regular and usual business hours"); *see also Top Flight, Inc. v. City of Inkster*, No. 06-12399, 2007 WL 643897, at *16 (E.D. Mich. Feb. 26, 2007) ("[T]he Ordinance now before this Court provides the temporal restriction necessary by limiting inspections to 'regular business hours.'"); *Kentucky Rest. Concepts, Inc. v. City of Louisville, Jefferson Cty., Ky.*, 209 F. Supp. 2d 672, 691 (W.D. Ky. 2002) ("[T]he addition of one simple phrase—'at reasonable times'—would remove the potential Fourth Amendment implications.").

### D.      Severability of the Ordinance

Finally, the City requests that if the Court were to find any provisions of the Ordinance invalid that the invalid provisions be severed, leaving the remaining portions intact.

Severability of a local ordinance "is a question of state law." *Coral Springs St. Sys., Inc. v. City of Sunrise*, 371 F.3d 1320, 1347 (11th Cir. 2004). "Florida law requires [a Court] to sever any provisions of [an] [o]rdinance that it finds unconstitutional, while allowing valid portions to stand, but only if problematic provisions can be distinguished and clearly separated from the remainder." *Cafe Erotica of Fla., Inc. v. St. Johns Cnty.*, 360 F.3d 1274, 1292 (11th Cir. 2004) (internal citation omitted). The Ordinance also contains a severability clause setting forth the City's intention that any invalid portion be severed and not affect the remaining portions of the Ordinance. [ECF No. 1-2, § 3].

The Undersigned finds that the employment eligibility portion is easily severed from the remaining portions. The provision requiring verification that any worker or performer "[i]s either a U.S. Citizen, legal resident, or otherwise legally permitted to be employed within the United States of America" would be deleted. *See* ECF No. 1-2, Sec. 18-913(1)(b). Further, the inspection requirements, providing that the documents referenced in subsections (1) through (5) must be available for inspection by the city upon demand, can also be severed from the remaining portions of the Ordinance, in order to prevent violation of the Fourth Amendment.

Severing the portions offending the First Amendment is more difficult, but the Undersigned finds that it can be done.

As discussed above, the Undersigned finds that the repeated ID verification for age and employment eligibility (now moot) is not narrowly tailored and thus burdens speech in violation of the First Amendment. Accordingly, subpart (1) of Sec. 18-913, requiring any performer or worker to provide proof of identification, should be severed. Otherwise, the Court would have to fashion the specific verification guidelines. *See Cafe Erotica of Fla., Inc. v. St. Johns Cty.*, 360 F.3d 1274, 1292 (11th Cir. 2004) ("The interests of federalism and comity dictate conservatism to federal courts in imposing their interpretative views on state statutes.").

Even though this severance removes the age verification from the Ordinance, the provision requiring adult entertainment clubs to verify that its dancers are not victims of human trafficking and are working on their own accord still remains, which is the City's ultimate goal. *See* ECF No. 124, p. 20 ("Removing any of those provisions still leaves in place a complete law to accomplish its anti-human trafficking purpose.").[20]

---

[20]   However, the Undersigned notes that when the City made this statement in its briefing, it appears that it did not anticipate that Count 7 (First Amendment burden) would not be dismissed. Thus, the City may find that the age verification requirement is central to completing the purpose of the Ordinance and it may decide to adopt a new Ordinance including this requirement (in a way that does not offend the First Amendment).

## IV.     Conclusion

For the reasons discussed above, the Undersigned **respectfully recommends** that the District Court **grant** Club Madonna's summary judgment motion [ECF No. 112] and enter judgment in its favor on Count 7 (First Amendment), Count 13 (preemption), and Count 16 (Fourth Amendment); and **deny** the City's summary judgment motion [ECF No. 116] as to Count 13 (preemption) and Count 16 (Fourth Amendment).

## V.     Objections

The parties will have fourteen (14) days from the date of being served with a copy of this Report and Recommendations within which to file written objections, if any, with United States District Judge Federico A. Moreno. Each party may file a response to the other party's objection within fourteen (14) days of the objection. Failure to file objections timely shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report except upon grounds of plain error

if necessary in the interest of justice. *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1 (2016).

**RESPECTFULLY RECOMMENDED**, in Chambers, in Miami, Florida, on May 5, 2020.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**Copies furnished to:**
The Honorable Federico A. Moreno
All counsel of record