UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Miami Division

**Case Number: 16-25378-CIV-MORENO**

CLUB MADONNA, INC. *d/b/a* CLUB
MADONNA,

        Plaintiff,

vs.

CITY OF MIAMI BEACH,

        Defendant.

_____/

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AS TO COUNTS 7 AND 16, GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AS TO COUNT 13

THE MATTER was referred to the Honorable Jonathan Goodman, United States Magistrate Judge, for a Report and Recommendation on the parties' motions for summary judgment. The Court has reviewed the entire record and *de novo* reviewed the issues raised in the cross-objections the Report and Recommendation. The Court finds that the City of Miami Beach's Ordinance requiring age verification for employees does not violate the First or Fourth Amendment. The Court further finds that the Ordinance's citizenship requirement is invalid and that severing that provision from the Ordinance is appropriate.

## BACKGROUND

Club Madonna is a fully nude strip club in Miami Beach. On January 6, 2014, City law enforcement officers executed a search warrant at the Club and discovered that a 13–year-old victim of human trafficking was being forced to dance nude at the Club. The victim began performing at the fully nude strip club after she ran away from home and was taken by four adult captors. The City rescued the victim and arrested her captors. Even though the victim performed at the Club on multiple occasions, the Club never asked her to provide any identification to verify her age. The City of Miami

Beach issued an Emergency Order temporarily suspending the Club's Occupational Licenses for six months after finding that the Club was engaged in conduct constituting an "actual threat to the public health, welfare and safety of residents of Miami Beach." The City reinstated the licenses after the Club agreed to enact written security standards, hire a Chief Compliance officer, check at least two forms of identification before allowing a performer to dance, and maintain records of who it let dance.

To prevent any similar incident from ever happening again, the City Commission enacted Ordinances 2015–3917 and 3926 (codified as § 18–913–915). The City of Miami Beach Human Trafficking Ordinance requires all nude dance establishments in the City to check the age and work eligibility of "any worker or performer," ensure through sworn statements that they are working of their own accord, and indefinitely maintain records of the documents and verification for inspection by the City upon demand. Club Madonna filed a complaint against the City, challenging the constitutionality of the Ordinance (Counts VII-XVI) and the suspension of the Club's Certificate of Use for 17 days (Counts I-VI).

This Court granted the City's initial Motion to Dismiss and dismissed all counts with prejudice. The Club appealed the dismissal of Counts III-V, VI (as to Due Process claim only), and Counts VII-XVI. On appeal, the Eleventh Circuit issued a Mandate that affirmed dismissal of Counts III-VI, X, and XII, and reversed dismissal of Counts VII-IX, XI, XIII-XVI. The City filed a renewed Motion to Dismiss, and this Court granted the motion with respect to Counts VIII, IX, XI, XIV, XV, leaving Counts VII, XIII, and XVI to now be resolved on summary judgment.

The Court finds the City is entitled to summary judgment on Counts VII (freedom of speech), Count XVI (Fourth Amendment), and the City is entitled to summary judgment on Count XIII (federal preemption). Thus, only Sec. 18-913(1)(b) is found unconstitutional and stricken and severed. The rest of the Ordinance stands. For reference, the Ordinance reads, in relevant part:

**Sec. 18-913. - Proof of identification for workers and performers, and shift logs required.**

All nude dance establishments as defined in section 142-1271 of the city Code, and as such section may be amended from time to time, must:

- 2 -

(1) Require any worker or performer entering the nude dance establishment to provide proof of an original, lawfully issued state or federal photo identification, and one additional form of identification that confirms he or she is:

(a) Eighteen years of age or older; and

(b) Is either a U.S. Citizen, legal resident, or otherwise legally permitted to be employed within the United States of America.

(2) Confirm that the person is working or performing of his or her own accord and is not being forced or intimidated into working or performing at the nude dance establishment. The confirmation as set forth within this subsection shall be pursuant to, and in compliance with subsection (4); and

(3) Maintain copies of those documents required in subsection (1) and (2) herein, and those documents must at all times be on the premises of the nude dance establishment for the duration the worker or performer is employed, hired or contracted at, or is permitted to work or perform at the nude dance establishment; and

(4) Verify the accuracy of those documents required in subsection (1) and (2) by preparing and retaining a sworn statement from the owner or manager of the nude dance establishment confirming that the individual performer is at least 18 years of age, is performing of her or his own accord, and is not being forced or intimidated into performing or working; and

(5) Maintain a check in/check out procedure and log whereby the documents referenced in subsection (1) are presented by the worker or performer upon entering the nude dance establishment, and the worker or performer logs in upon entering and logs out prior to exiting the nude dance establishment. The log shall indicate:

(a) The name(s) of the manager(s) of the nude dance establishment on duty at the time of the log in and log out;

(b) The worker or performer's actual name; a unique identifier, if any (e.g., employee number or stage name); the job title or role at the nude dance establishment (e.g., performer, employee, server, bartender); the log in and log out times; and

(b) The manager who confirmed that the identifications referenced in subsection (1) were inspected and verified.

The documents referenced in subsections (1) through (5) must be available for inspection by the city upon demand, and the nude dance establishment shall not refuse access to these documents for inspection by the city. No person shall be allowed to enter or perform at the nude dance establishment or who has not been presently verified consistent with those provisions identified within subsections 18-913(1) through (5).

## **Legal Standard**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state

- 3 -

on the record the reasons for granting or denying the motion." Fed. R. Civ. P. 56(a). Thus, the Court may enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## COUNT VII – FIRST AMENDMENT – BURDEN ON SPEECH

In Count VII, the Club alleges that the Ordinance's provisions that require daily check-in and verification procedures for all workers and indefinite record keeping impose unconstitutional burdens on the Club's freedom of speech in violation of the First Amendment. Magistrate Judge Goodman recommends that the Court grant summary judgment to the Club on its First Amendment claim because the City did not use substantially less restrictive and precise methods to achieve its stated goal of preventing human trafficking, and the repeated identification verification (for age and employment eligibility) requirement is not narrowly tailored, and thus burdens speech in violation of the First Amendment.

As a threshold matter, the City objects that First Amendment analysis is unnecessary because the Ordinance does not burden expressive conduct. The City argues the Ordinance does not regulate the stripping itself and is thus not a regulation of speech at all. The Court agrees. The expressive conduct at issue here is the nude dancing itself. Both parties agree that nude dancing is owed at least some First Amendment protection because of the erotic message it conveys. *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 566 (1991). But the Ordinance does not regulate nude dancing; it regulates the unlawful conduct of human trafficking and child labor. The Supreme Court has held that a party that engages in First Amendment-protected conduct is not exempt from potentially burdensome laws merely because they are in the business of expression. In *Arcana v. Cloud Books*, an adult bookstore that sold sexually explicit material and had private booths available for viewing the material was searched pursuant to a report about illicit sexual activity on the premises. Law enforcement personally observed solicitation of prostitution and other illicit sexual acts, all of which were in full view of the

- 4 -

business' owner. 478 U.S. 697, 698-99 (1986). The bookstore was then sued under the applicable New York public health laws. In Cloud Books' complaint against the government, it alleged that enforcement of the health laws against it would violate the First Amendment because of the impact on Cloud Books' protected bookselling activities. The New York Court of Appeals agreed, applied scrutiny appropriate for a regulation aimed at nonspeech activity but having an incidental effect on speech, and found that the closure of the store was broader than necessary under the First Amendment. *Id.* at 701-02.

The Supreme Court granted certiorari and reversed. *Id.* In holding that First Amendment scrutiny was inapposite when reviewing a law that does not single out First Amendment expression, the Court stressed the "fallacy of seeking to use the First Amendment as a cloak" for unlawful conduct by the "diaphanous device of attributing protected expressive attributes to that conduct." *Id.* at 705. The Court went on to compare the public health law at issue to a neutral tax law that happened to apply to a newspaper or shutting a bookstore down for fire code violations. *Id.* Ultimately, the Court held the New York Court of Appeals misapplied the *O'Brien* test. *Id.* ("First Amendment values may not be invoked by merely linking the words 'sex' and 'books.'"). Here, identically, First Amendment scrutiny does not apply to an ordinance ensuring the Club does not violate widely applicable laws against human trafficking and child labor simply because the Club and its employees express a protected message in their day-to-day business.

The Club argues that *Arcara* cannot apply here because the holding is limited to laws of general application, and here, the Club asserts, nude dance establishments bear a disproportionate burden under the Ordinance. True, the Ordinance only applies to nude dance establishments, but what the Ordinance actually requires the Club to do should be familiar to all businesses that present ample opportunity for illegal activity involving minors. For example, all patrons must show identification before entering a bar or a casino. Eleventh Circuit precedent does not compel a different conclusion. Cases such as *Lady J. Lingerie v. City of Jacksonville* or *Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee Cty., Fla.* apply

- 5 -

First Amendment Scrutiny to content-neutral laws regulating nude dance establishments, but the regulations at issue in those cases are hour and zoning regulations respectively; they clearly are "time, place, manner" restrictions that the Supreme Court evaluates under the test delineated in *City of Renton v. Playtime, Theatres, Inc.*, 475 U.S. 41 (1986). Even though such restrictions are content neutral, they can still severely limit First Amendment expression—for instance, a law that restricts nude dance establishment operating hours to Noon-5 P.M. But the Ordinance at issue here has nothing to do with how the dancers dance, when the Club can be open, the areas of the City in which it is allowed to operate, or any similar restriction that is remotely tied to the expressive message of erotic dancing. Rather, the Ordinance simply requires the Club to verify its employees' identities and ages, and make those records available for inspection.

Even if First Amendment scrutiny were to apply, the Ordinance is narrowly tailored and not unduly burdensome. The City objects that Magistrate Judge Goodman misreads the Ordinance to require Club Madonna to *make copies* of identification *every time* and write out the sworn statement *every time*, when, in reality, the copies and sworn statement only need be made once and then checked against the identification presented every time. The Court agrees with the City's objections on this point. The Ordinance must be read reasonably and with an understanding of how it has been enforced thus far. The City states in the record and at oral argument that copies need not be made and a sworn statement need not be prepared *every time* an employee comes to work. Rather copies would be made upon hiring and then *checked* against two forms of identification each day. Likewise, the City represented that the Ordinance is a reasonable check-in/check-out procedure—it would not be enforced to require the Club to re-do their procedures each time an employee stepped out to grab something from the car. Indeed, records produced by the Club in discovery show that it did not copy two forms of identification or prepare a sworn statement before every performer's shift. Rather, the performers' files, while often incomplete, contained single copies of the identifications and a sworn statement, and the Club used the same log-in sheet it had been using for years to document that the performers' age

- 6 -

had been verified before each shift. (D.E. 115 ¶¶ 19-20; D.E 115-10.)

The Club further objects that the Ordinance is substantially broader than necessary to serve the City's interest. The Court disagrees. A content-neutral regulation aimed at conduct unrelated to the expression must pass a less stringent constitutional test than if it regulated the content of the expressive speech itself. *Ward v. Rock Against Racism*, 491 U.S. 781, 798-99 (1989); *see also City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47 (1986); *see, e.g., City of Erie v. Pap's A.M.*, 529 U.S. 277 (2000), 289-90; *Texas v. Johnson,* 491 U.S. 397, 403 (1989). *See also United States v. O'Brien,* 391 U.S. 367, 377 (1968). Magistrate Judge Goodman thoroughly explained that "a regulation is narrowly tailored as long as 'the means chosen are not substantially broader than necessary to achieve the government's interest," (D.E. 144 at 17 (citing *Ward*, 491 U.S. at 800)), and thus the Ordinance "need not be the least restrictive or least intrusive means of doing so," *id.* (citing *Daytona Grand, Inc. v. City of Daytona Beach, Fla.*, 490 F.3d 860, 885 (11th Cir. 2007)). The Club argues that the Ordinance is not narrowly tailored because there are readily available alternatives to the Ordinance's requirements that would serve the City's interests equally well without infringing on its First Amendment rights so severely. In support, the Club pointed to ordinances in Jacksonville, Gainesville, Brevard County, and Bay County that do not require adult nightclubs to verify the age and employment status of a dancer or any other employee every time he or she comes to work. However, this Court's role is not that of a legislative body, but simply ruling on the constitutionality of what the City enacted.

The City meets its burden of narrow tailoring if the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation. *Ward*, 491 U.S. at 798-99. *See also Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee Cty., Fla.*, 337 F.3d 1251, 1273 (11th Cir. 2003) (noting that despite the [government's] burden, "the District Court should be careful not to substitute its own judgment for that of the County. The County's legislative judgment should be upheld provided that the County can show that its judgment is still supported by credible evidence, upon which the County reasonably relies."). The Eleventh Circuit later explained that this

- 7 -

determination "requires deference to the reasoned judgment of a governmental entity." *Flanigan's Enter., Inc. of Ga. v. Fulton Cty., Ga.*, 596 F.3d 1265, 1279 (11th Cir. 2010); *see also Daytona Grand, Inc. v. City of Daytona Beach, Fla.*, 490 F.3d 860, 880 (11th Cir. 2007) ("[A] city must have latitude to experiment, at least at the outset, and . . . very little evidence is required."). There is no dispute that the Ordinance furthers the City's goal of reducing human trafficking and child labor, and now the Court agrees with the City that the Ordinance is not substantially broader than necessary to meet that objective. It is not the role of the courts to engage in line-drawing exercises. *Lady J. Lingerie*, at 1365 (declining to find that a time, place, manner restriction was not narrowly tailored because the strip club must close between 2 A.M. and Noon, rather than just 2 A.M. and 10 A.M.). Additionally, the Ordinance leaves ample alternative avenues of expression. All the Club or a dancer must do is comply with common-sense verification requirements. *Id.* ("Since the rule also leaves open reasonable alternative avenues of expression . . . it is valid."). Finally, Magistrate Judge Goodman found that the repeated identification verification was not narrowly tailored because the City did not use far-less restrictive means, and he cites *FF Cosmetics FL, Inc. v. City of Miami Beach*, 866 F.3d 1290, 1301 (11th Cir. 2017). There, however, there was evidence the City deliberately chose the more restrictive means because the City had already adopted the less restrictive version for similar conduct, and the City itself offered alternatives for the trial court's consideration. *Id.* The *FF Cosmetics* panel explicitly noted "there is a significant distinction between failing to employ less-restrictive means and completely disregarding obvious less-burdensome alternatives." *Id.* The Court is not presented with a situation where the City considered and rejected obviously less-burdensome alternatives, nor is it presented with a situation in which the burden on speech is anything more than minimal. For those reasons, the Court does not adopt the Magistrate Judge's Report and Recommendation, and grants summary judgment to

Miami Beach on Count VII.[1]

## COUNT XVI – FOURTH AMENDMENT – ADMINISTRATIVE SEARCH

In Count XVI, the Club brings a facial challenge on Fourth Amendment grounds alleging the Ordinance unconstitutionally allows the City to conduct warrantless administrative searches and seizures at any time without the Club's permission and does not give the Club an opportunity for precompliance review before a neutral decisionmaker. The Ordinance's relevant provision provides, "[t]he documents referenced in subsections (1) through (5) must be available for inspection by the city upon demand, and the nude dance establishment shall not refuse access to these documents for inspection by the city." § 18-913.

Under the Fourth Amendment, "searches conducted outside the judicial process, without prior approval by a judge or a magistrate judge, are per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions." *City of Los Angeles, Calif. v. Patel*, 135 S. Ct. 2443, 2452 (2015) (internal citation omitted). "[I]n order for an administrative search to be constitutional, the subject of the search must be afforded an opportunity to obtain precompliance review before a neutral decisionmaker." *Id.* For example, if a business refused an administrative search of its records, the business owner "must be afforded an opportunity to have a neutral decisionmaker review an officer's demand to search the [records] before he or she faces penalties for failing to comply." *Id.* at 2453. The "availability of precompliance review alters the dynamic between the officer and the [business] to be searched, and reduces the risk that officers will use these administrative searches as a pretext to harass business owners." *Id.* at 2454. Such review is not provided for here.

However, precompliance review is not necessary for administrative searches of "closely regulated" industries. Owners of closely regulated businesses have reduced expectations of privacy

---

[1] The City did not move for summary judgment in writing, but the Court may grant summary judgment *sua sponte* under Federal Rule of Civil Procedure 56(f), and both parties agree that this case is to be decided as a matter of law as there are no factual disputes.

given the pervasive government regulation, and the interests of the government are heightened given the inherent risks of these businesses. Thus, a warrantless inspection of commercial premises is more likely to be reasonable within the meaning of the Fourth Amendment. *N.Y. v. Burger*, 482 U.S. 691, 702 (1987). Laws that allow for administrative searches of those industries are evaluated under a less demanding three-part constitutional test, discussed below. *See Patel*, 576 U.S. 409, 426 (citing *N.Y. v. Burger,* 482 U.S. 691, 702–703 (1987)).

The Supreme Court has recognized four such industries: liquor sales, firearms dealing, mining, and operating an automobile junkyard. The Club argues that this Court should interpret this to mean that closely regulated industries are expressly limited to those four industries. That argument ignores the fact that the lower federal courts and state courts have recognized a bevy of other closing regulated industries including pharmaceuticals, the medical profession, food, nuclear power, storing and dispensing gasoline, construction, day cares and nursing homes, asbestos removal, solid waste disposal, credit unions, pawnshops, banking, insurance, commercial trucking, purchase of precious metals and gems, casinos, adult entertainment stores, and massage parlors.[2] As Justice Scalia noted in *Patel*, the four industries recognized by the Supreme Court tells us "more about how the Court exercises its discretionary review than it does about the number of industries that qualify as closely regulated." *Patel*, 576 U.S. at 2461 (Scalia, J., dissenting).

Nude dancing clubs like Club Madonna have long been pervasively regulated. *See City of Erie v. Pap's A.M.*, 529 U.S. 277, 299, 302 (2000) (upholding ordinance barring full nudity at nude dancing club); *see also Flanigan's Enters., Inc. of Ga. v. Fulton Cty., Ga.*, 596 F.3d 1265, 1269 (11th Cir. 2010) (upholding ordinance barring the sale of alcohol at adult entertainment establishments); *FW/PBS, Inc. v. City of Dallas*, 837 F.2d 1298, 1306 (5th Cir. 1988), *aff'd in part, vacated in part on other grounds*, 493 U.S. 215 (1990) ("Communities long have been concerned about the effects of sexually oriented businesses and have attempted to cope with those effects through regulation."). Indeed, the City of

---

[2] *Rethinking Closely Regulated Industries*, *Note*, 129 Harv. L. Rev. 797, 805-06 (2016) (collecting cases).

Miami Beach itself heavily regulates adult entertainment. For example, it requires a cabaret license, and places special zoning limitations on clubs to ensure

they are not too close to churches, parks, or schools. *See* Miami Beach Code § 142-1272 (requiring adult entertainment establishments are at least 300 feet from "house of worship, school, public park or playground). Further, to combat the harmful secondary effects associated with mixing

nudity and liquor, the City Code prohibits the sale of alcohol in fully nude dance establishments. Miami Beach Code § 6-40 ("Total nudity and sexual conduct prohibited"). Any business owner that gets into the adult entertainment business would surely have a diminished expectation of privacy as a result. In sum, Magistrate Judge Goodman capably analyzes this question, and the Court refers readers to the Report at 39-41 for fuller exploration. The Court agrees with the Report's finding that the Eleventh Circuit would likely find adult entertainment clubs to be closely regulated if presented with the question. R&R at 41.

Under the more relaxed closely regulated industry test, the Ordinance would need to satisfy the following criteria: (1) there must be a substantial government interest that informs the regulatory scheme pursuant to which the inspection is made; (2) the warrantless inspections must be necessary to further the regulatory scheme; and (3) the statute's inspection program, in terms of the certainty and regularity of its application, must provide a constitutionally adequate substitute for a warrant. *Patel*, 135 S. Ct. at 2456 (citing *N.Y. v. Burger*, 482 U.S. 691, 702 (1987)). Both parties agree the City has a substantial government interest in curtailing human trafficking and in ensuring that the Club maintains accurate and complete records verifying the age of its employees.

With respect to the second requirement, the Court disagrees with Magistrate Judge Goodman that the surprise inspections allowed under the Ordinance are *not* necessary to further the goals of the Ordinance. The City presents evidence that while surprise inspections were in use, Club Madonna did not violate the Ordinance. However, when those inspections were no more, the Club fell out of compliance. (D.E. 115 ¶¶ 19-21.) Although this is a facial challenge, these details are still relevant—

they provide important color as to why surprise inspections are necessary to achieving the City's worthwhile objectives. Surprise inspections for closely regulated businesses have been endorsed by other courts, including the Eleventh Circuit. *See, e.g.*, *United States v. Biswell*, 406 U.S. 311, 316 (1972) ("[I]f inspection is to be effective and serve as a credible deterrent, unannounced, even frequent, inspections are essential. In this context, the prerequisite of a warrant could easily frustrate inspection; and if the necessary flexibility as to time, scope, and frequency is to be preserved, the protections afforded by a warrant would be negligible."); *Crosby v. Paulk*, 187 F.3d 1339, 1347 (11th Cir. 1999) ("Requiring inspectors or other law enforcement agents to obtain warrants before conducting an investigation might alert nightclub and bar owners to the impending inspection, which would defeat the purpose of the inspection: to investigate for violations of the Georgia Department of Revenue statutes relating to alcohol."); *Heffner v. Murphy*, 745 F.3d 56, 68 (2014) (noting that surprise inspections prevent unscrupulous funeral practitioners from bringing their establishments into regulatory compliance prior to an inspection, only to let them fall below prescribed standards when the threat of detection passes). Just one day of work for an underaged nude dancer is one day too many. The City reasoned that random, surprise inspection was necessary to combat such harms, and this Court believes that is an appropriate assessment.

Finally, as to the third requirement, the certainty and regularity of the Ordinance's application provides a constitutionally adequate substitute for a warrant. The goal of this prong is to ensure the Ordinance is "sufficiently comprehensive and defined that the owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes." *Burger*, 482 U.S. at 703 (citations omitted). "The regulatory statute must perform the two basic functions of a warrant: it must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers." *Id.* The Ordinance does both. It clearly puts nude dance establishments that searches are authorized by City law, and it limits the object of the search to the records mandated

- 12 -

earlier in the Ordinance. City enforcement officers do not have free reign to search any other part of the Club. The Eleventh Circuit has found warrantless search statutes to sufficiently cabin discretion when the regulation specifically describes the type of object or document to be searched. *United States v. Ponce-Aldona*, 579 F.3d 1218, 1226 (11th Cir. 2009). The Ordinance is even more specific here. It not only identifies *categories* that will be searched, but it delineates the specific documents.

The Report relies on the Supreme Court's *Patel* decision to find that the Ordinance is deficient under the certainty and regularity prong. The law in *Patel* was unconstitutional because it failed to constrain police officers' discretion where there was no limitation on which hotels out of thousands would be searched, nor how often. But, as the City notes in its objections, there are important differences between the Los Angeles regulation at issue in *Patel* and the Ordinance that make the case inapposite here. The Los Angeles regulation concerned around 2,000 hotels and subjected a much larger group of *private guest records* to inspection. (*See* D.E. 150 at 16–18.) Here, on the other hand, the City argues that the Ordinance is very specific about which documents may be demanded (the identification verification and check-in logs) and limits searches to nude dance establishments (there is only one in Miami Beach). Additionally, the Eleventh Circuit has no requirement that the Ordinance be temporally limited as the Club and Magistrate Judge Goodman suggest. *United States v. Ponce-Aldona*, 579 F.3d 1218, 1224 (11th Cir. 2009) ("We rejected this argument, citing other courts who had reasoned that imposing time limits on searches of commercial vehicles would eviscerate the search scheme and render it meaningless. Additionally, we noted that this circuit had previously approved an administrative search scheme with no time limits."). Thus, the Ordinance's lack of a time restriction is not fatal.

It also must be noted that the records that are the object of the City's inspections are themselves creatures of the Ordinance. Without the Ordinance, there would be nothing for the City to inspect. Indeed, these records are the only things the City can inspect pursuant to this Ordinance. Surely such a circumscribed inspection of records the City has the authority to ask the Club to create in the first

place gives the Club enough notice and sufficiently cabins officer discretion as to be a constitutionally adequate substitute for a warrant.

Thus, the Court does not adopt the Report and Recommendation on Count XVI, and grants summary judgment to the City.

## COUNT XIII – FEDERAL PREEMPTION UNDER THE IMMIGRATION

### REMOVAL AND CONTROL ACT

In Count XIII, the Club alleges that the Ordinance violates the Supremacy Clause of the United States Constitution because Sec. 18-913(1)(b) is expressly and impliedly preempted by the Immigration Reform and Control Act of 1986. Magistrate Judge Goodman found that the section is conflict preempted by the Act and thus recommends that the Court grant summary judgment to the Club. Conflict preemption occurs where compliance with both federal and state regulations is physically impossible. *Ariz. v. United States*, 567 U.S. 387, 399 (2012) (citations omitted).

The City objects that the Ordinance cannot be conflict preempted because the Ordinance falls within the Act's savings clause, which states that licensing laws and laws similar to licensing laws are *not expressly preempted* by the Act. The Immigration Reform and Control Act "*expressly preempts* 'any State or local law imposing civil or criminal sanctions (**other than through licensing and similar laws**) upon those who employ, or recruit or refer for a fee for employment, unauthorized aliens.'" *Id.* (citing § 1324a(h)(2)) (emphases added). Neither party argues that the Ordinance is expressly preempted because the Ordinance deals with verification rather than hiring.

Even though the Act only mentions *express preemption*, the City argues that because the Ordinance should be considered a "licensing [or] similar law," that it cannot be *conflict preempted* either. This is not so. Assuming without deciding that the Ordinance is a "licensing [or] similar law," and thus falls within the savings clause, the Court still finds the Ordinance to be conflict preempted. The savings clause saves the Ordinance from express preemption, but not all preemption. Geier v. Am. Honda Motor Co., 529 U.S. 861, 869 (2000) ("We now conclude that the saving clause (like the express

pre-emption provision) does *not* bar the ordinary working of conflict pre-emption principles.")

Now, onto conflict preemption. The City objects that the savings clause, even though it is not an absolute barrier to conflict preemption, should inform our conflict preemption analysis because "[g]iven that Congress specifically preserved such authority for the States, it stands to reason that Congress did not intend to prevent the States from using appropriate tools to exercise that authority." *Chamber of Commerce of U.S. v. Whiting*, 563 U.S. 582, 600–01 (2011) (D.E. 150 at 19.). The Court agrees. But the tools still must be appropriate. In other words, they must not be conflict preempted by the Act (or any other federal statute for that matter). As Magistrate Judge Goodman explained, under the Ordinance, the Club is required to verify that "*any worker or performer*" entering the establishment provide proof confirming that she "is either a U.S. Citizen, legal resident, *or otherwise legally permitted to be employed* within the United States of America." *See* § 18-913(1) (emphases added). By requiring the Club to verify whether *any* worker or performer is legally permitted to be employed within the United States the Ordinance conflicts with the Act because "Congress purposefully excluded independent contractors and other non-employees from the scope of the restrictions contained in the IMMIGRATION REMOVAL AND CONTROL ACT." *See* 8 U.S.C. § 1324a(a)(1)(A); *see Chamber of Commerce of U.S. v. Edmondson*, 594 F.3d 742, 769 (10th Cir. 2010) (stating Congress has "intentionally excluded independent contractors from verification obligations"); *see also Lozano v. City of Hazleton*, 724 F.3d 297, 306 (3d Cir. 2013) (citing H.R. Rep. No. 99–682(1), at 57, 1986 U.S.C.C.A.N. 5649, 5661) ("Congress explicitly declined to sanction employers based on the work authorization status of 'casual hires (*i.e.*, those that do not involve the existence of an employer/employee relationship).'").

On the other hand, the Supreme Court's decision in *Whiting* describes a prime example of a state using appropriate tools to take advantage of the authority left to them by Congress. "The Arizona law provides that '[k]nowingly employ an unauthorized alien' means the actions described in 8 United States Code § 1324a,' and that the 'term shall be interpreted consistently with 8 United States Code §

- 15 -

1324a and any applicable federal rules and regulations.'" *Whiting,* 563 U.S. 582. at 602–03 (emphasis added) (internal quotations omitted). Crucially, by incorporating by reference the federal definition of "employee," Arizona exempts independent contractors and casual hires from its statute and thus avoids frustrating Congress' objectives—namely, excluding independent contractors from the statute's purview and keeping the cost of making casual hires low. *See* 8 C.F.R. § 274a.1(f) (excluding "independent contractor" from the definition of "employee").

It is clear that Congress intended to exempt casual hires from the Immigration Removal and Control Act. *See* H.R. Rep. No. 99–682(1), at 57, 1986 U.S.C.C.A.N. 5649, 5661 ("It is not the intent of this Committee that sanctions would apply in the case of casual hires (i.e., those that do not involve the existence of an employer/employee relationship"). The Court agrees with the Third Circuit's analysis in *Lozano v. City of Hazelton.* Finding the city's employment law preempted, the Third Circuit wrote, "[g]iven the intricate framework of the Immigration Removal and Control Act, we cannot assume that the distinction is immaterial. Rather, it appears to be a deliberate distinction that Congress included as part of the balance it struck in determining the scope and impact of the Immigration Removal and Control Act's employer sanctions. However, Hazleton's ordinance does not distinguish between employees, on the one hand, and independent contractors or casual hires, on the other." 724 F.3d 297, 307 (2013). Neither does the City's.[3] Thus, it is preempted by federal law and cannot stand under the Supremacy Clause.

The City also objects that Magistrate Judge Goodman erred in concluding that the Ordinance obstructs the objectives of the Immigration Reform and Control Act by "declin[ing] to consider the

---

[3] The Court recognizes neither Tenth nor Third circuit precedent is binding, but it finds those Court's rationales persuasive. The Eleventh Circuit, too, has found the Immigration Removal and Control Act's "lengthy legislative history" to be persuasive in finding state law preempted, even though the conflict preemption was not clear from the Immigration Removal and Control Act's text. *See U.S. v. Alabama,* 691 F.3d 1269 (2012). Granted, this decision did not concern the independent contractor vs. employee distinction, but rather the Act's preemption of state penalties on unauthorized alien *employees* in addition to Congress' penalties on *employers. Id.* at 1300.

distinction between the Ordinance's comprehensive scheme to prevent human trafficking in strip clubs and regulations expressly designed to regulate immigration" in *Lozano* and *Edmondson*. The Court again disagrees. As Magistrate Judge Goodman explained, "[t]he City's purpose in enacting the Ordinance is irrelevant because the Ordinance *still* requires verification of the eligibility of all workers, including independent contractors and other casual hires, *which conflicts* with Congress's intent to limit the Immigration Removal and Control Act's application to the employer/employee relationship." (D.E. 144 at 34 (emphasis added).)

Magistrate Judge Goodman further noted that the City did not provide "any case law supporting the notion that a municipality's intent to not conflict with federal objectives will save an otherwise conflict preempted ordinance" or showing that "a more-noble purpose (*i.e.*, preventing human trafficking, as opposed to the preventing the hiring of unauthorized aliens) can somehow save local legislation otherwise invalid because of conflict preemption." *Id.* The City's objections suffer the same deficiency.

Finally, the City objects that Magistrate Judge Goodman disregarded the City's argument that the Club's dancers are employees, not independent contractors. The Court finds no error. Magistrate Judge Goodman aptly explained that this argument by the City "is irrelevant to Club Madonna's *facial* challenge" because "[f]urther factual development cannot assist in resolution of these facial challenges, which raise purely legal issues." (D.E. 144 at 33 n.15 (citing *Club Madonna, Inc. v. City of Miami Beach*, 924 F.3d 1370, 1380 (11th Cir. 2019).) For all these reasons, the City's objections are **OVERRULED**. Sec. 18-913(1)(b) should be removed from the Ordinance.

## SEVERABILITY

Finally, Court finds the preempted provision may be severed. Severability of a local ordinance "is a question of state law." *Coral Springs St. Sys., Inc. v. City of Sunrise*, 371 F.3d 1320, 1347 (11th Cir. 2004). "Florida law requires [a Court] to sever any provisions of [an] [o]rdinance that it finds unconstitutional, while allowing valid portions to stand, but only if problematic provisions can be

distinguished and clearly separated from the remainder." *Cafe Erotica of Fla., Inc. v. St. Johns Cnty.*, 360 F.3d 1274, 1292 (11th Cir. 2004) (citation omitted).

To recap, the Court has found only Section 18-913(1)(b) to be unconstitutional. Where severance is possible and the municipality has "expressed [a] legislative desire to keep as much of its ordinances as it can," to decline to apply the doctrine of severability "would seriously infringe on the notion of legislative autonomy[.]" *Coral Springs*, 371 F.3d at 1349. Here, the City agrees that although the now severed provisions "are important to the Ordinance's purpose and enforcement scheme, severance would leave minimum safety protocols to still help accomplish its anti-human trafficking purposes." (D.E. 152 at 17.) The rest of the provisions can surely stand on their own. They aim to accomplish goals separate from verifying citizenship status and have their own enforcement mechanism.

## CONCLUSION

With the benefit of the parties' briefs, Magistrate Judge Goodman's Report and Recommendation, and oral argument, for all the reasons explained above, it is

**ADJUDGED** that the Objections to the Report and Recommendation (**D.E. 147, 150**) are **OVERRULED IN PART**, the Report and Recommendation (**D.E. 144**) is **ONLY ADOPTED IN PART**, Defendant's Motion for Summary Judgment on Counts VII and XVI (**D.E. 116**) is **GRANTED**, and Plaintiff's Motion for Summary Judgment on Count XIII (**D.E. 112**) is **GRANTED**.

**DONE AND ORDERED** in Chambers at Miami, Florida, this ⟍⟋ of November 2020.

_____
FEDERICO A. MORENO
UNITED STATES DISTRICT JUDGE

Copies furnished to:

United States Magistrate Judge Jonathan Goodman

Counsel of Record

- 18 -